IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN M. HANK, | ) | Case No. 1:16-cv-02104 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| GREAT LAKES CONSTRUCTION | ) | |
| CO., et al., | ) | |
| Defendants. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

I.      **Introduction and Procedural Background**

Plaintiff, Steven M. Hank, sued his former employer, Great Lakes Construction Co.

("Great Lakes") and his union, the International Union of Operating Engineers, Local 18 (the

"Union") (collectively, the "defendants") after his employment ended on January 22, 2016.  On

that date, Hank signed a document in which he agreed to be placed on lay-off status, rather than

being terminated, in exchange for Great Lakes' agreement not to contest his application for

unemployment compensation benefits.  Hank also agreed not to file any sort of claim against

either Great Lakes or the Union and not to seek reemployment with Great Lakes.  Thereafter,

Hank filed a complaint in Cuyahoga County Common Pleas Court, alleging that: (1) Great Lakes

and the Union discriminated against him based on a disability, in violation of Ohio Rev. Code

Ann. § 4112.02 ("Count I"); (2) Great Lakes discriminated against him based on his age, in

violation of Ohio Rev. Code Ann. §§  4112.02 and 4112.14 ("Count II"); (3) Great Lakes

retaliated against him for filing Workers' Compensation claims, in violation of Ohio Rev. Code

Ann. § 4123.90 ("Count III"); and (4) Great Lakes breached the CBA and the Union breached its duty of fair representation ("Count IV").  ECF Doc. 1-1.  Great Lakes and the Union removed the case to this court based on their contention that any cause of action asserted in Count IV arose, if at all, under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.  Thus, the Defendants asserted that this Court has federal question jurisdiction over Count IV under 28 U.S.C. § 1331, and supplemental jurisdiction over Hank's state law claims in Counts I through III under 28 U.S.C. § 1367.  ECF Doc. 1, Page ID# 2–3.

Hank alleges that his disability, age discrimination, workers' compensation retaliation, and breach of CBA claims arise from two series of events.  The first involved Hank's attempts to obtain permission and compensation for treating repeated injuries to his left knee, suffered while working in Great Lakes' paint shop.  The second set of events involved Great Lakes' allegation that Hank falsified time records and its confrontation of Hank in the presence of a representative from the Union.  That meeting culminated in the parties' signing of a release, in which Great Lakes agreed to lay off, rather than terminate, Hank.  In exchange, Hank agreed not to file any grievances or claims arising under the CBA against Great Lakes, and that he would not seek reemployment with Great Lakes.

The Union now seeks summary judgment (ECF Doc. 178), contending that Hank has failed to adduce sufficient evidence to allow a reasonable jury to conclude that the Union discriminated against him on the basis of a disability, or that the Union breached its duty of fair representation.  The Union has also moved to strike (ECF Doc. 186) an affidavit Hank attached to his response in opposition to the Union's motion for summary judgment (ECF Doc. 183-3), asserting that the affidavit is a sham affidavit contradicting Hank's deposition testimony in an improper attempt to create an issue of material fact.

Because I agree that Hank has failed to produce evidence sufficient to create a genuine issue of material fact, and the Union is entitled to judgment as a matter of law on Hank's claim under Section 301 of the LMRA, 29 U.S.C. 185, I recommend that the Union's motion for summary judgment be **GRANTED** as to Claim IV.  Further, because Hank's affidavit is admissible in part under the sham affidavit rule, I recommend that the Union's motion to strike be **DENIED**.  Finally, because summary judgment on Hank's Section 301 claim leaves Hank without any claims over which this Court has original jurisdiction, I recommend that we decline to exercise supplemental jurisdiction over Hank's remaining state law disability discrimination claim, and that the Union's motion to remand that claim to state court be **GRANTED**.

II.     **Factual History**

  A.  **Hank's Workplace Injuries and Ohio Bureau of Workers' Compensation**

The following facts are undisputed or established by the Rule 56 evidence.  Hank worked as a sandblaster for Great Lakes from October 29, 2007, until January 22, 2016.  ECF Doc. 183, Page ID# 4475–76.  He is a member of the Union.  *Id.* at 4475.  As a Union member, the CBA between Great Lakes and the Union governed the terms and conditions of Hank's employment.  ECF Docs. 19 and 19-3, Page ID# 192, 267–316.  Hank received copies of the CBA from time to time, but did not receive the most recent version of the agreement.  ECF Doc. 19, Page ID# 192–93.  Hank is 49-years-old, holds a General Equivalency Diploma, and has post-high-school-level proficiencies in reading comprehension and word recognition.  ECF Doc. 104-1, Page ID# 1926.

On March 27, 2012, Hank injured his knee after he fell while sandblasting a trailer.  ECF Doc. 183, Page ID# 4475.  Hank reported the injury to his supervisor, John Tighe, and other individuals.  *Id.*  He underwent surgery to repair his knee, and he filed a claim with the Ohio Bureau of Workers' Compensation (the "BWC") in June 2012.  *Id.*

3

Although Hank claims that recovery from the type of knee surgery he had generally requires six weeks, his doctor released him to return to work after a week and a half because Great Lakes allegedly only allowed him 13 days of unpaid leave.  *Id.*  Upon returning to work, Hank resumed his former job duties in the paint shop.  *Id.*  No light duty work was available.  *Id.* Hank claims that, due to his early return to regular duty, he suffered another injury to the same knee in May 2013.  *Id.*  Hank reported his new injury to his supervisors and received an injection to alleviate his symptoms.  *Id.*  Hank injured his knee again in June 2015 and received another injection, which did not alleviate his symptoms.  *Id.*  Hank alleges that, in August 2015, he took an unpaid week of leave due to the severe pain in his left knee.[1]  *Id.*

In October 2015, Hank retained counsel, following Great Lakes' denial of his requests for treatment.  *Id.* at 4476.  Thereafter, CareWorks, a third party administrator, notified Great Lakes of additional claims Hank had filed.  *Id.*  Hank alleges that he advised his superiors at Great Lakes that he intended to file two additional BWC claims regarding his May 2013 and June 2015 knee injuries.  *Id.*  Hank filed those claims in December 2015.  *Id.*  At a BWC hearing on January 21, 2016, he testified regarding his workplace injuries and treatment.  *Id.*

### B.    Hank's Layoff from Great Lakes

In November 2015, Safety Director William Hocevar audited Great Lakes' time card processes.  ECF Doc. 137 at 3245.  Hocevar reported to George Palko, the president of Great Lakes, that Hank's timesheets did not represent the time he was actually present at the paint shop.[2]  ECF Docs. 137 and 183, Page ID# 3246–48, 4477.

---

[1] Hank states that he took a week off in August 2016; however, the context of his statements, as well as his January 2016 end of employment, suggests that his leave occurred in August 2015.  *See* ECF Doc. 183, Page ID# 4475.

[2] Hank states, without citation to evidence in the record, that "[s]ubpoenaed records . . . confirm that there was no such audit."  ECF Doc. 183, Page ID# 4477.

4

On January 22, 2016, Great Lakes called Hank to a meeting with four Great Lakes managers, who accused him of falsifying his time cards.  ECF Doc. 183, Page ID# 4476.  Hank's Union representative, Jacob Seisel, was also present.  ECF Docs. 19 and 183, Page ID# 179, 4476.  Great Lakes' equipment manager (who was responsible for signing off on paint shop employee time cards and who had the ability to approve extra time for employees) was not present at the meeting.  ECF Doc. 183, Page ID# 4477–78.  At the time, Seisel had worked for the Union for seven to eight months, and he had received in-house training through the Union. ECF Doc. 138, Page ID# 3367–69.

The Great Lakes representatives allegedly compared Hank's time cards with video surveillance footage on certain dates and believed that Hank had falsified his time cards and was paid for time he did not work.  ECF Docs. 137 and 183, Page ID# 3250, 3263–64, 4477–78.  The Great Lakes representatives spoke with Hank's supervisor, Tighe, who stated that he arrived to work before Hank on Saturdays, did not tell Hank what to write on his time card, and did not see Hank's time card for the specific Saturdays for which he had allegedly falsified his time cards. ECF Doc. 183, Page ID# 4478.

The Great Lakes representatives and Seisel went from a conference room to the company boardroom and summoned Hank from the shop floor.  ECF Docs. 19 and183, Page ID# 181, 4478.  Palko asked Hank about his time cards, and Hocevar read the times listed on the cards and the entrance and exit times listed in the video.  ECF Docs. 19 and183, Page ID# 181–82, 4478. Hank declined to watch the surveillance videos or review the disputed time cards, and he allegedly did not dispute the evidence or accusations against him.  ECF Docs. 19 and 183, Page ID# 181–83, 4478–79.  Palko asked Seisel if he had anything to say, and Seisel stated that he could not give an opinion, but that "contractors do not hesitate to terminate employees for

5

stealing."  ECF Docs. 137 and 139, Page ID# 3268, 3585 *see also* ECF Doc. 183, Page ID# 4478–79 ("Mr. Palko asked Mr. Seisel, Hank's Union representative, if he had anything to say, and Mr. Seisel could not given an opinion, but stated that 'every contractor that he had dealt with would have terminated Mr. Hank based on the facts he had heard but, again, stressed that he could not give an opinion.'").  Seisel later testified that he based his statement on his experience working for various contractors, and he testified that he believed Hank had admitted to stealing at the meeting.  ECF Doc. 139, Page ID# 3586–87.

The Great Lakes representatives then exited the boardroom, leaving Hank alone with Seisel.  ECF Doc. 183, Page ID# 4479.  During that time, Hank told Seisel that he believed Great Lakes was getting rid of him because of his workers' compensation claim.  ECF Doc. 139, Page ID# 3581.  Seisel asked Hank if he wanted to file a grievance, and Hank replied that he did not wish to pursue a grievance.  ECF Doc. 139, Page ID# 3580–81.  Hank asked Seisel for advice, but Seisel did not have any advice for him.  ECF Doc. 19, Page ID# 184.  Hank testified that he thought Seisel appeared uncomfortable, as though he had never been in such a situation before. *Id.* at 183.

After a few minutes, the Great Lakes representatives returned to the boardroom with two letters.  ECF Docs. 19, 178, and 183 , Page ID# 185, 4311, 4479.  The first letter, dated January 22, 2016, and entitled "Termination Notice," stated:

> Effective today Steven Hank has been terminated for falsification of The Great Lakes Construction Company timecards.  This termination is pursuant to Article II Section 10 of the Collective Bargaining Contract.  Specifically on numerous occasions, Mr. Hank inflated the number of hours he actually worked.  His falsification is a violation of The Great Lakes Construction Company Workplace Conduct Guidelines.  His conduct violated rule numbers 15 and 17.

ECF Doc. 113-5, Page ID# 2206.  The second letter, also dated January 22, 2016 and entitled

"Acknowledgement and Agreement" ("the Release"), stated:

> The Great Lakes Company ("Great Lakes") agrees that instead of terminating
> Steven Hank for falsification of time records, it will place him on lay-off status
> with no right to recall.  In return, Hank agrees that he will not file a grievance
> under the Collective Bargaining Agreement and that he will not pursue or file any
> sort of claim against either Great Lakes or his Local 18 of the International Union
> of Operating Engineers ("Union").  Mr. Hank agrees that he will not seek
> reemployment at any time in the future with Great Lakes.  The Union agrees that
> it will not pursue or file any grievance on Mr. Hank's behalf.

*Id.* at 2207.

Hank asked for clarification about what the Release meant, and a Great Lakes

representative explained that he would be able to collect unemployment, but could not file a

grievance.  ECF Doc. 19, Page ID# 185.  The Great Lakes representative explained that, if Hank

had filed a grievance, Great Lakes would fight him on unemployment, and he would probably

not be able to collect unemployment.  *Id.* at 189.  Seisel told Hank that "it was his choice as to

whether or not he took option one or two."  ECF Doc. 139, Page ID# 3585.  Hank and Seisel

signed the Release.  ECF Docs. 19 and 139, Page ID# 185, 3584.  Seisel was not authorized to

sign the Release.  ECF Docs. 132 and 139, Page ID# 2637–38, 3596.  After the Release was

executed, Great Lakes placed Hank on layoff status and paid him an unemployment benefit of

approximately $472 per week for 6 months.  ECF Doc. 19, Page ID# 204–05.

Hank testified that he did not "completely understand" the Release when he signed it, and

that he felt that he was forced to sign the agreement because he needed to collect unemployment.

*Id.* at 188, 191–92, 244.  Nonetheless, Hank testified that "[t]here was no threat."  *Id.* at 244.  He

also testified that he understood the Release meant that: (1) he would be laid off or unemployed;

(2) he would not have a right to recall; (3) he agreed not to file any grievance under the CBA or

claim against Great Lakes; and (4) Great Lakes would "probably fight [him] on unemployment

and [he] would probably not be able to collect unemployment" if he filed a grievance. *Id.* at 189–91. Hank stated that he understood giving up his right to file a claim against Great Lakes meant that he would "walk away peacefully." *Id.* at 190. He stated that he was not sure what the CBA was, and that he understood a grievance was "[a] disagreement." *Id.* at 190–91.

When asked about his investigation, Seisel testified that, before signing the Release, he did not ask for copies of Hank's time cards; rather, the time cards were presented during the meeting. ECF Doc. 139, Page ID# 3587, 3589. Seisel stated that the time cards were available to go through, "but [Hank] had admitted to stealing and how am I supposed to represent a member that steals." *Id.* Seisel testified that he did not explain to Hank that the Release meant that Hank would not be recalled to Great Lakes because he "thought it was pretty self-explanatory," and he did not discuss the Union's referral system at the meeting. *Id.* at 3592. When asked why he did not have a private meeting with Hank's supervisor, Tighe, Seisel stated that he "was new at the job at that time." *Id.* at 3588. He stated that, in hindsight after having had additional training and being more seasoned, he would have had a discussion with Hank and Tighe before the meeting with the Great Lakes representatives. *Id.* at 3588–89.

## C.  Hank's Grievance

On January 29, 2016, Hank, through counsel, demanded that the Union process a grievance challenging his separation from employment with Great Lakes. ECF Doc. 178, Page ID# 4312. The Union's District Representative, Thomas Perevosnik, met with Hank on February 3, 2016, discussed the circumstances of Hank's end of employment, and assisted Hank in preparing a written grievance. *Id.* In his grievance, Hank alleged that he and Tighe had worked the same hours in 2015, and that he believed he was terminated because he had an ongoing workers' compensation claim. ECF Docs. 19-5, 178, and 183, Page ID# 373, 4312, 4483. Hank

sought a return to his position at Great Lakes plus back pay.  *Id.*  Hank explained to Perevosnik that he had injured his knee in 2012, "popped" it again a year later, received cortisone shots for the injury, and then "recently" reinjured it.  ECF Doc. 138, Page ID# 3381.

Perevosnik investigated Hank's grievance as an "unjust discharge grievance" under Article II, Paragraph 10 of the CBA, which provided that the employer was the sole judge of whether an employee's performance is unsatisfactory and that no employee would be discharged for defending his rights under the CBA.  ECF Docs. 19 and 138, Page ID# 275, 3381–83.  Perevosnik faxed the grievance to Great Lakes.  ECF Doc. 138, Page ID# 3384.

On February 9, 2016, a Great Lakes representative faxed a letter to the Union, responding to Hank's grievance.  *Id.*  Great Lakes denied the grievance, asserted that Hank waived all his claims when he signed the Release, and noted that the grievance was also untimely.  ECF Docs. 138 and 178, Page ID# 3384, 4313.  Nonetheless, on February 12, 2016, Perevosnik and Seisel met with two Great Lakes representatives for a Step 2 meeting.  ECF Doc. 178, Page ID# 4313.  The Great Lakes representatives reiterated that Hank and the Union had already signed a release, and they asserted that Great Lakes had the right to terminate Hank based on his falsified time cards.  *Id.*  Perevosnik and Seisel reviewed the timecards and videos.  *Id.*  Perevosnik and Seisel confirmed that the videos showed that Hank typically arrived to work an hour after Tighe and left at the same time as Tighe; however, Hank's time cards indicated that he worked the same number of hours as Tighe on each of the dates in question.  *Id.* at 4313–14.  Perevosnik and Seisel also confirmed that, based on the videos, Hank was not actually at the paint shop for all the hours reported on his time cards.  *Id.* at 4314.  Perevosnik and Seisel determined that that the discrepancy resulted in Hank being paid for time he did not work, including 62 minutes on November 21, 2015; 65 minutes on November 28, 2015; 52 minutes on December 5, 2015; and

55 minutes on December 12, 2015.  *Id.*  Perevosnik and Seisel also spoke with Tighe, who stated that he had never completed Hank's time cards and that he had not authorized Hank to report more hours than he had actually worked.  *Id.*  Tighe informed Perevosnik and Seisel that each employee, including Hank, was individually responsible for completing his time cards.  *Id.*

After the Step 2 meeting, the Union concluded that Great Lakes had sufficient evidence that Hank stole time by falsifying his time cards, and that the Union lacked any direct evidence that Hank's termination from Great Lakes was retaliation for filing his workers' compensation claim.  *Id.* at 4314–15.  Thus, the Union determined that Hank's grievance was meritless, informed him that it was not well-taken, and informed him that the Union would not process it any further.  *Id.* at 4315.

When asked what the Union should or should not have done in processing his grievance, Hank testified that he did not know and could not answer the question.  ECF Doc. 19, Page ID# 246.  When asked how the Union discriminated against him, Hank stated, "They didn't."  *Id.* at 247.  When asked about when the Union perceived him as disabled, Hank stated, "I did not know they did. . . . I would have no way of knowing that."  *Id.*

### D.    The Union's Referral System

At the same meeting during which Hank wrote his grievance, Perevosnik explained the Union's referral system and invited Hank register for employment through it.  ECF Docs. 19 and 138, Page ID# 237, 337–38.  On February 3, 2016, Hank filed a registration card with the Union, stating that he was qualified to operate a "skid steer," "loader," and "power broom."  ECF Docs. 19-8 and 178, Page ID# 376, 4313.  He also indicated that he would not accept work in Erie County, Geauga County, Lake County, or Ashtabula County.  ECF Doc. 19-8, Page ID# 376.  In April 2016, Hank's card was modified to state that he would not work in Huron County,

and that he sought work operating a backhoe, forklift, sandblaster, IST crane, or aerial lift.  *Id.*
In June 2016, Hank's card was modified to state that he sought work operating a "dozer –
rough."  *Id.*  Hank's registration card indicated that he had a seniority level of A.  *Id.*

Perevosnik also gave Hank a training manual and advised him to get forklift certification,
because most of the calls for forklift operators required certification.  ECF Doc. 138, Page
ID# 3379–80.  He also advised Hank to get OSHA-10 and OSHA-30 certification, which would
assist him in obtaining additional employment opportunities.  *Id.* at 3380.  Perevosnik testified
that the Union provided the recommended training to its members through its apprenticeship
program, and that Hank would not have had to pay for it.  *Id.*  Perevosnik also testified that the
Union did not keep any files regarding members' injuries or physical disabilities, and did not
keep information on employers who had accommodations or the ability to work with disabled
individuals.  *Id.* at 3423–24.

The Union claims that it attempted to refer Hank to six jobs, including the following.
ECF Doc. 178 at 4315–16.  On June 13, 2016, the Union dispatcher attempted to refer Hank to a
job operating a backhoe for Parisi Construction; however, Hank did not receive the job because
the phone number he provided on his registration card was not in service.  *Id.* at 4315.  On June
14, 2016, the Union dispatcher attempted to refer Hank to a job operating a backhoe for Parisi
Construction, but Hank did not receive the job because he failed to return the dispatcher's call
within ten minutes.  *Id.*  On June 15, 2016, the Union dispatcher attempted to refer Hank to a job
operating a backhoe for Utilicon, but Hank did not return the dispatcher's call.  *Id.*  On June 20,
2016, the Union dispatcher offered Hank a job operating a finish dozer and backhoe for Premier
Asphalt, but Hank declined the job because he could not operate a finish dozer.  *Id.*  On July 13,
2016, the dispatcher attempted to refer Hank to a job operating a loader for Stein, but Hank did

11

not return the dispatcher's call.  *Id.* at 4316.  On July 21, 2016, the Union dispatcher offered

Hank a job operating a power broom for Karvo Paving.  *Id.*  Hank accepted the job, and the

dispatcher informed him where and when to report for duty.  *Id.*  Hank's registration card was

then removed from the referral deck and placed into the "working file."  *Id.*  The Union claims

that Hank had not called to re-register for the employment referral system, or contacted the

Union to state whether he was employed elsewhere, after the Karvo Paving referral.  *Id.*

Hank claims that that the Union "referred [him] to four different companies for work."

ECF Doc. 183, Page ID# 4481.  Hank testified that he received only two calls from the Union

dispatcher the entire time he was registered for work.  ECF Doc. 19, Page ID# 245.  He asserts

that he received the Union dispatcher's call regarding the finish dozer job referral, but that his

registration card stated that he was not qualified for such work.  ECF Docs 19 and 183, Page

ID# 241, 245, 4481–82.  Hank claims that he did not accept the assignment with Karvo Paving

because "it was only two days' worth of work" and he was going to start a full time job with full

benefits two days after that assignment.  ECF Docs 19 and 183, Page ID# 242–43, 245, 4482.

When asked about his allegation that the Union intentionally attempted to refer him to jobs for

which it knew he was not qualified, Hank testified, "[t]hat's not true. . . they only knew what

they seen [sic] on the registration card. . . . They weren't asking me to run a big giant crane that

I'm not qualified to do, no."  ECF Doc. 19, Page ID# 244–45.  Hank stated that he did not "feel

[the Union did] enough to help [him, because he] would have thought there would have been

more than two places that needed operators for equipment to be run."  *Id.* at 250; *see*

*also* ECF Doc. 183-3, Page ID# 4516  ("I don't feel they've done enough to help me when I got

fired.  I also don't feel like they've done enough to help me find a job.").

Hank also claims that the Union dispatcher called other union members who had later registration dates than Hank for certain jobs.  ECF Doc. 183, Page ID# 4482.  The Union dispatcher testified that she called a Union member with a registration date of March 9, 2016, for a job operating a "shuttle lift," and that she did not refer Hank to the job.  ECF Doc. 67-1, Page ID# 984–85.  The dispatcher stated that a shuttle lift is a type of crane.  *Id.* at 987.  When asked why she did not first call Hank, the dispatcher stated that she could not answer that question without looking at the individuals' registration cards.  *Id.* at 985.  The dispatcher testified that, she then tried to refer the shuttle lift job to a master mechanic with a registration date of April 26, 2016.  *Id.* at 986.  The dispatcher then contacted Union members from seniority level C, and eventually filled the shuttle lift job with someone from seniority level D.  *Id.* at 991–94, 211–212.  When asked why she chose someone from seniority level D before calling Hank, who had crane and lift experience, the dispatcher stated that she did not know and could not answer that question.  *Id.* at 211–12.

### E.  Relevant Provisions from the CBA

The CBA provided that no employee would be terminated, except for just cause.  ECF Doc. 183, Page ID# 4503.  The CBA also provided that:

> The Employer is to be the sole judge as to the satisfactory performance of work by an employee and may discharge any employee whose work is unsatisfactory, or who fails to observe the safety precautions or other rules and regulations prescribed by the Employer for the health, safety and protection of its employees.

ECF Doc. 19-3, Page ID# 275.  Further, the Union retained the "sole and exclusive[]" right to manage its business.  *Id.* at 294.  In describing an employee's right to recall, the CBA provides that an employee "shall have recall rights for up to one (1) year after initial lay-off, provided he/she has the experience and qualifications as determined by the employer to do the job."  *Id.* at 308.

The CBA established a four step grievance process.  ECF Doc. 19, Page ID# 293.  At Step 1, an employee would orally present the grievance to the employer within three days of the discovery of the grievance.  *Id.*  The employer would not consider any grievance filed 15 days after the precipitating incident, and any untimely grievance would be deemed waived.  *Id.*  At Step 2, the employee would file a written grievance within three days of the Step 1 meeting, and if no settlement was reached within 10 days, a representative from the Union and the employer could meet to negotiate a final and binding settlement.  *Id.*  If there was no settlement within five days of the Step 2 meeting, the grievance could be referred to a State Joint Committee at Step 3. *Id.*  If Step 3 did not result in a settlement within 15 days, then the grievance would be referred to arbitration at Step 4.  *Id.*

### F.      Hank's Errata Sheet and Affidavit

On April 27, 2017, I entered an order granting Hank leave to file an errata sheet to his deposition by May 11, 2017.  ECF Doc. 33, Page ID# 468.  Hank filed his errata sheet on May 17, 2017.  ECF Docs. 39 and 40.  In August 2017, I entered an order striking Hank's errata sheet as untimely, noting that Hank did not request leave of court to file his errata sheet late or attempt to demonstrate excusable neglect.  ECF Doc. 79, Page ID# 1505–06.

Hank has supported his response in opposition to the Union's summary judgment motion by an "affidavit clarifying deposition testimony."  ECF Doc. 183-3.  Hank's affidavit is identical in substance to his errata sheet, with each paragraph stating an error in his deposition testimony, offering an explanation for the error, and proffering a corrected statement.  *Compare* ECF Doc. 183-3, Page ID# 4509–17, *with* ECF Doc. 40, Page ID# 507–13.  In relevant part, Hank made the following changes in his affidavit:

14

In paragraphs 5 and 7, Hank states that, during his deposition, he answered "no" when asked whether he was threatened and "there was no threat" when asked whom he alleged coerced him.  ECF Doc. 183-3, Page ID# 4509–10.  As clarification, Hank states that he would have stated "[n]o one physically threatened me," if he had understood the word "threat" at that time. *Id.* at 4510.  Similarly, in paragraph 8, Hank states that he testified that "I signed it because I need to make—I need to collect unemployment" in response to him being asked whether he was coerced into signing the Release.  *Id.*  He states that, if he had understood the word "coercion," he would have instead stated, "I don't know what coercion means—I signed it because they said I couldn't collect unemployment if I didn't."  *Id.* at 4511.

In paragraphs 9 through 12, Hank discusses his responses to questions about his allegations that the Union intentionally tried to refer him to jobs for which he was not qualified. *Id.* at 4511–12.  In paragraph 9, Hank states that he would change his testimony that "that's not true" in response to being asked about his allegation that the Union tried to refer him to jobs for which he was not qualified, to "I don't know what they do in their office, but they didn't give me any significant help to get a job, and they didn't help me keep my job. . . . They didn't help me." *Id.* at 4511.  In paragraph 10, he states that, instead of testifying that the Union "only knew what they seen [sic] on the registration card," he would have stated "I only gave them the registration card, but they knew about me and did not help me," if he had understood the question asking him about whether the Union knew that he did not qualify for the jobs it referred him to.  *Id.*  In paragraph 11, Hank states that, instead of testifying that the Union "wasn't asking me to run a big giant crane that I'm not qualified to run," he would have stated "[t]hey offered me two jobs—one I wasn't qualified for, and the other job only lasted a couple of days" if he had understood the question he was asked.  *Id.* at 4511–12.  In paragraph 12, Hank states that he

15

testified "no" when asked, "So [the Union wasn't] intentionally trying to refer you to jobs for which [it] knew you were not qualified." *Id.* at 4512.  He states that he was "confused about the inner working of the Union and its referral system," and that he would have instead stated "they didn't appear to be trying to help me . . . I don't know how to prove what they intended." *Id.*

In paragraph 13, Hank states that he answered "I don't know. I can't answer that," when asked what the Union did wrong in processing his grievance. *Id.*  He states that, if he were not confused by the question, he would have answered "I don't know.  I can't answer that.  All I know is I got hurt, I got fired, they didn't help me, and they haven't really helped me get any significant work." *Id.*  Similarly, in paragraph 14, Hank states that, if he were not confused when asked what the Union should have done in processing his grievance he would not have answered "I don't know.  I have no answer." *Id.*  Instead, he states that he would have testified "I still do not know.  I have no answer.  I don't know how they process a grievance.  They should have fought the termination and gone to arbitration." *Id.* at 4512–13.

In paragraph 15 and 25, Hank addresses his responses to questions about his allegations that the Union discriminated against him.  *Id.* at 4513, 4515.  In paragraph 15, he states that he answered "they didn't," when he was asked how the Union discriminated against him.  He states that, he was confused about the Union's inner workings, and that, if he had understood the question, he would have instead stated "I don't know what they did, as I wasn't in their office.  I was injured, I got fired, and the Union didn't help me.  I am still injured and the Union hasn't helped me get a job, aside from one I was not qualified for and one that only lasted for a couple of days." *Id.*  In paragraph 25, Hank states that, when asked if he was aware of the Union ever discriminating against him, he stated, "no." *Id.* at 4515.  He states that if he was not confused about the question, he would have stated, "I don't know the inner workings of the Union.  All I

16

know is that I was injured before I was fired.  They didn't help me when I got fired.  They know

I am still hurt and haven't helped me get a job, outside of one job I was not qualified for and

another job that only lasted for a couple of days." *Id.*

In paragraph 16, Hank states that he answered, "I did not know they did," when asked

when the Union perceived him as disabled.  *Id.* at 4513.  He states that he was confused by the

word "perceived," and that he would have answered, "I'm not sure what you mean by 'perceive'

here," if he had understood the question.  *Id.*  Similarly, in paragraph 17, Hank states that he

answered, "I would have no way—I would have no way of knowing that," after he was asked

whether he was contending that the Union perceived him as disabled at some point.  *Id.*  He

states that if he had not been confused about what the word "perceived" meant, he would have

additionally stated, "The Union knew I was injured—I don't know which people specifically."

*Id.*

In paragraph 18, Hank states that he answered, "I don't know if they ever did," when

asked when the Union did not honor the call list and bypassed him in violation of the law.  *Id.*

He states that he was confused about the inner workings of the Union and its referral system, and

that, if he understood the question, he would have additionally stated, "I know they didn't help

me find a job, aside from one I was not qualified for and one that only lasted a couple days."  *Id.*

at 4513–14.  Similarly, in paragraph 19, Hank states that he answered, "I don't know," when

asked when the Union failed to advise employers that he was available to work.  *Id.* at 4514.  He

states that, he was confused about the inner workings of the Union, and that he would have

answered, "I don't know if they did.  I know they didn't help me find a job, aside from one I was

not qualified for and one that only lasted a couple days."  *Id.*

In paragraphs 6, 20 through 24, 27, and 29 through 30, Hank states that he responded "no" when asked whether he had evidence to support his various allegations. *Id.* at 4510, 4514–17. He states that he was confused by the use of the word "evidence," and seeks to change his testimony to "I don't know what you mean by evidence." *Id.*

## III.    Law and Analysis

### A.    Summary Judgment Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Maben v. Thelen*, 887 F.3d 252, 258 (6th Cir. 2018). The moving party must demonstrate the "basis for its motion, and identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotation omitted). The nonmoving party may not simply rely on his pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted). A reviewing court must determine whether the evidence that the nonmoving party relies upon "presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. In evaluating the evidence presented on a summary judgment motion, courts must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 255. Nonetheless, a court need not accept unsupported or conclusory statements as true. *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment.").

### B.        The Union's Motion to Strike Hank's Affidavit

The Union moves to strike as a sham affidavit paragraphs 5 through 25, 27, and

29 through 30 of Hank's affidavit.  ECF Doc. 186, Page ID# 4553–64.  The Union argues that

Hank's affidavit is a "carbon copy" of the errata sheet that was stricken as untimely, and that the

statements in it directly or indirectly contradict Hank's deposition testimony in an attempt to

create a sham issue of fact.  *Id.* at 4552, 4555.  The Union asserts that Hank did not offer a

persuasive justification for his altered testimony, and that he merely "feign[ed] confusion" to

create a sham issue of fact.  *Id.* at 4555–64.  As an alternative to striking Hank's affidavit, the

Union requests this court to permit Hank's deposition to be reopened to allow the Union to re-

examine him on the issues raised in the affidavit.  *Id.* at 4564.  The Union asserts that reopening

Hank's deposition would neither prejudice the parties nor result in undue delay, as the Court has

not yet set a date for a final pretrial conference or a trial.  *Id.* at 4565.

Hank response asserts that his affidavit is not subject to a motion to strike under

Fed. R. Civ. P. 7(a) and 12(f).  ECF Doc. 190, Page ID# 4608–09.  Instead, he contends that this

court should determine whether his affidavit is admissible or inadmissible under the sham

affidavit rule.  *Id.* at 4609–10.  Hank argues that his affidavit does not contradict his deposition

testimony, but merely clarifies his testimony after "having had the opportunity to actually

understand what defense counsel was asking him in the deposition."  *Id.* at 4610–13.

Under the Sixth Circuit's sham affidavit rule, "[a] party may not create a factual issue by

filing an affidavit, after a motion for summary judgment has been made, which contradicts her

earlier deposition testimony."  *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th

Cir. 1986).  In deciding whether a post-deposition affidavit is admissible at the summary

judgment stage, a court must first determine whether the affidavit directly contradicts the

nonmoving party's prior sworn testimony. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). "A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.* If there is no direct contradiction, a court should not strike or disregard the affidavit, unless the affidavit is an attempt to create a sham fact issue. *Id.* To determine whether an affidavit is an attempt to create a shame fact issue, courts consider several factors, including: (1) whether the affiant was cross-examined during his earlier testimony; (2) whether the affiant had access to the pertinent evidence at the time of his earlier testimony; (3) whether the affidavit was based on newly discovered evidence; and (4) whether the earlier testimony reflects confusion that the affidavit attempts to explain. *Id.* If the alleged inconsistency created by the affidavit is independently supported by other evidence in the record, there is no sham fact issue. *See O'Brian v. Ed Donnelly Enters.*, 575 F.3d 567, 593 (6th Cir. 2009) (holding that the district court should not have disregarded an affidavit when the alleged inconsistency existed within the original deposition itself); *Baer v. Chase*, 392 F.3d 609, 625 (3rd Cir. 2004) ("When there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit.").

I conclude that Hank's affidavit is inadmissible, in part, as a sham affidavit. Hank's affidavit testimony is directly inconsistent with his deposition testimony to the extent that he seeks to erase his testimony that: (1) he admitted "that's not true" that the Union attempted to refer him to jobs he did not qualify for, in paragraph 9; (2) the Union "only knew what they seen [sic] on the registration card," in paragraph 10; (3) the Union "wasn't asking me to run a big giant crane that I'm not qualified to run," in paragraph 11; and (4) that he believed the Union did not discriminate against him, in paragraphs 15 and 25. *Aerel, S.R.L.*, 448 F.3d at 908; ECF Doc.

183-3, Page ID# 4511–13, 4515.  Further, his assertion that he was confused about the questions does not offer a compelling justification for erasing these statements, as defense counsel asked his questions in plain English, the record shows that Hank had post-high school level comprehension, and Hank's answers were unambiguous.  *Aerel, S.R.L.*, 448 F.3d at 908; ECF Doc. 183-3, Page ID# 4511–13, 4515.  Thus, to the extent that Hank's affidavit seeks to erase these statements, it is a sham affidavit.  I recommend that the Court find his affidavit inadmissible in part as evidence in opposition to the Union's motion for summary judgment.

The rest of Hank's affidavit is admissible under the sham affidavit rule, because it does not directly conflict with his deposition testimony and does not create a sham fact issue.  *Aerel, S.R.L.*, 448 F.3d at 908.  Hank's changes in paragraphs 5 and 7 do not directly conflict with his prior testimony, as the changes merely clarify that he understood "threatened" to mean "physically threatened" and that he did not feel physically threatened.  ECF Doc. 183-3, Page ID# 4509–10.  Hank's original deposition testimony also independently supports any inconsistency caused by those changes, as well as the change in paragraph 8, because Hank testified that Great Lakes representatives told him that they would fight him on unemployment if he did not agree to refrain from filing a grievance and his need to collect unemployment compelled him to sign the release.  *O'Brian*, 575 F.3d at 593; ECF Doc. 19, Page ID# 185, 188–92, 244.  Further, any inconsistency caused by the changes in paragraphs 9 through 19 and 25, other than the erasures discussed above, already existed in the record, as other evidence in the record showed that: (1) Hank was injured on the job and filed a workers' compensation claim; (2) he was removed from his position at Great Lakes; (3) he told the Union about his injury and that he believed his termination was related to his workers' compensation claim; (4) the Union referred him to one job he was unqualified for and another job that only offered two days' work;

and (5) he believed the Union did not do enough to help him in his termination or in finding a new job.  *O'Brian*, 575 F.3d at 593; *Baer*, 392 F.3d at 625; ECF Docs. 19, 19-5, 138, and 138, Page ID# 218-19, 241–43, 250, 373, 3381, 3581.  Finally, Hank's changes in paragraphs 6, 20 through 24, 27, and 29 through 30 do not create a sham fact issue, as neither his original or altered testimony supports any facts beyond whether he possessed favorable evidence at the early stages of discovery.  ECF Doc. 183-3, Page ID# 4510, 4514–17.  Accordingly, Hank's affidavit is admissible in part, and I recommend that the Court deny the Union's motion to strike Hank's affidavit.  On the other hand, I recommend the Court disregard paragraphs 9, 10, 11, 15 and 25 of Hank's affidavit.

### C.    Hank's Section 301 Claim

The Union argues that it is entitled to summary judgment on Hank's Section 301 claim because Hank has not produced any evidence that Great Lakes breached the CBA or that the Union breached its duty of fair representation.  ECF Doc. 178, Page ID# 4328–36.  The Union asserts that, under the CBA, Great Lakes retained the authority to discharge any employee whose work was unsatisfactory or who failed to follow workplace rules, and that Great Lakes validly exercised its authority to manage its business when it prohibited the falsification of company forms, documents, or records and the failure to provide a fair day's work for a fair day's pay.  *Id.* at 4329–30.  The Union contends that Great Lakes validly exercised its authority to enforce those rules when it laid off Hank based on "irrefutable proof" that he falsely represented the hours he worked.  *Id. at* 4330.  Moreover, the Union argues that Hank cannot establish that Great Lakes breached the CBA as a matter of law, because he released all his claims under the CBA.  *Id.* at 4334–36 & n.15.  The Union also argues that Hank failed to produce evidence that it breached its duty of fair representation by acting in a discriminatory, arbitrary, or bad faith manner in

representing him.  *Id.* at 4330–34.  The Union asserts that the record shows it satisfied its duty when: (1) Seisel obtained proof of Hank's misconduct (Hank's falsified timecards and security footage) from Great Lakes; (2) Hank admitted that he submitted false timecards and indicated that he would not be interested in contesting his layoff; and (3) Seisel reasonably concluded that Great Lakes had sufficient evidence to discipline Hank under the CBA.  *Id.* at 4332. Furthermore, the Union contends that Hank has not produced any evidence that he was threatened or coerced into signing the release, and that Seisel acted reasonably when he told Hank that employers typically do not hesitate to terminate employees for falsifying timecards. *Id.*  The Union also asserts that Hank has not produced any evidence that it breached its duty of fair representation in processing his grievance.  *Id.* at 4333–34.[3]

Hank responds that, notwithstanding the court's determination that he cannot assert a claim against Great Lakes, he is not precluded from showing that Great Lakes breached the CBA in his claim against the Union.  ECF Doc. 183, Page ID# 4496, 4502.  Hank argues that Great Lakes breached the CBA by "coerc[ing]" him into signing a release depriving him of his "non-waivable" one-year right to recall after being laid off.  *Id.* at 4502.  He also asserts that the Release breached the CBA by impermissibly depriving him of his right to grieve, and that his inaccurate time cards did not give Great Lakes just cause to terminate him.  *Id.* at 503.  Hank contends that, even if he cannot show that Great Lakes breached the CBA, his claim that the Union breached its duty of fair representation may still prevail as a distinct claim under Section 9(a) of the LMRA.  *Id.* at 4497–98, 4502.  He argues that he produced sufficient evidence to create a genuine issue of material fact as to whether the Union breached its duty of fair representation because the Union permitted another member to take his position after he was

---

[3] The Union's reply in support of its motion for summary judgment generally reiterates the arguments made in its opening brief.  *See* ECF Doc. 187-1, Page ID# 4589–99.

terminated on a grounds other than intoxication, negligence, or incompetence. *Id.* at 4503. Hank also asserts that a genuine issue of material facts exists as to whether Seisel's failure to advise Hank of his rights, failure to advocate for Hank at the meeting with Great Lakes, unauthorized signing of the Release, and failure to take Hank's grievance to arbitration was "arbitrary, discriminatory, and/or bad faith conduct by the Union." *Id.* at 4503–04.

A union has a judicially implied duty to fairly represent its members, which arises out of the executive power granted to unions under Section 9(a) of the Nation Labor Relations Act ("NLRA"), 29 U.S.C. § 159(a). *Storey v. Local 327, Int'l Bhd. of Teamsters*, 759 F.2d 517, 518 (6th Cir. 1985). A breach of that duty is actionable under either Section 301 of the LMRA, 29 U.S.C. 185 (a "hybrid Section 301 claim"), or under Section 9(a) of the NLRA, 29 U.S.C. § 159(a), and 28 U.S.C. § 1337 (providing federal courts with jurisdiction to hear "any civil action . . . arising under any Act of Congress regulating commerce") (a "Section 9(a) claim"). *Adcox v. Teledyne*, 21 F.3d 1381. A plaintiff asserting a hybrid Section 301 claim against his union must show both that: (1) his employer breached the CBA; and (2) his union breached its duty of fair representation. *Garrish v. Int'l Union, et al.*, 417 F.3d 590, 594 (6th Cir. 2005); *see also Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 630 (6th Cir. 2009) ("[l]iability attaches to neither employer nor union unless fault can be proved as to both" elements). A plaintiff asserting a Section 9(a) claim, on the other hand, may prevail by showing only that his union breached its duty of fair representation. *See Vencl v. Int'l Union of Operating Eng'rs*, 137 F.3d 420, 424–25 (6th Cir. 1998) (discussing the difference between hybrid Section 301 claims and Section 9(a) claims).

A hybrid Section 301 claim is implicated when the claim arose from circumstances rooted in the relationship between the plaintiff, his union, and his employer, whereas a

24

Section 9(a) claim is implicated when the claim arose from circumstances rooted in the relationship between the plaintiff and his union only. *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 561–62 (6th Cir. 1990). When a plaintiff alleges that his claim arises under both Section 301 and Section 9(a), courts should look to the "essential nature of [the] complaint" to determine whether the claim arises under Section 301 or Section 9(a). *See id.* at 562 (stating that overlooking the essential nature of a plaintiff's "quintessentially hybrid 301 claim" would circumvent the requirement that he show both a breach of the CBA and a breach of the duty of fair representation "simply by artfully . . . casting [his] duty of fair representation claim[] as [an] independent cause[] of action"); *see also Pratt v. UAW, Local 1435*, 939 f.2d 385, 389 (6th Cir. 1991) ("Thus, *White* seemed to create a test which required that if a plaintiff's complaint stated a 'colorable claim' under the collective bargaining agreement, it must be construed as a Section 301 claim rather than a Section 9(a) claim.").

In *White*, an employee filed a grievance after he was fired for causing a "major accident." 899 F.2d at 557. The grievance was resolved in the employer's favor because the CBA allowed for discharge due to major accidents. *Id.* Thereafter, the employee filed a claim, alleging that his employer fired him in violation of the CBA and his union had breached tis duty of fair representation. *Id.* The Sixth Circuit held that the district court properly granted the employer and the union's motion for a directed verdict on the employee's hybrid Section 301 claim because, given the clarity of the employer's authority to discharge an employee for a major accident, the employee could not prove that the employer breached the CBA. *Id.* at 558. The Sixth Circuit also rejected the employee's argument – that, by invoking both Section 301 and 28 U.S.C. § 1337 in his complaint, he alleged a fair representation claim that was separate and

25

distinct from his hybrid Section 301 claim – because the employee's complaint alleged a "quintessential hybrid 301 claim." *Id.* at 559, 561–62.

In *Pratt v. UAW, Local 1435*, the Sixth Circuit held that the district court erred by relying on *White* in construing an employee's claim against his union as a hybrid Section 301 claim. 939 F.2d 385, 389 (6th Cir. 1991). The Sixth Circuit noted that the employee's complaint did not allege that his employer breached the CBA, that he had never named his employer as a defendant, and that he did not file a grievance under the CBA. *Id.* Further, the Sixth Circuit noted that, although the employee alleged that his claim arose under both Section 301 and Section 9(a), the breach alleged in his complaint was independent of the CBA and supported only an action under Section 9(a). *Id.* Thus, the Sixth Circuit determined that the employee's complaint did not present a "quintessential hybrid 301 claim." *Id.* (quotation omitted).

"The duty of fair representation requires a union to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 619 (6th Cir. 2010) (quotation omitted); *see also Dragomier v. Local 1112 Int'l Union UAW*, 64 F. Supp. 3d 1033, 1054 (N.D. Ohio 2014) (noting that the standard is the same in a hybrid Section 301 claim and a Section 9(a) claim). A union breaches this duty when its conduct is arbitrary, discriminatory, or in bad faith. *Merritt*, 613 F.3d at 619. To survive a motion for summary judgment on a duty of fair representation claim, "the plaintiff must point the court to evidence in the record supporting at least one of these elements." *Id.*

A union acts in an arbitrary manner if, "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003)

(quotation omitted); *see also Air Line Pilots Ass'n, Int'l v. O'Niell*, 499 U.S. 65, 78 (stating that a plaintiff must prove that the union's conduct was "wholly irrational" in order to prevail).  Mere negligence, ordinary mistakes, errors, or flaws in judgment will not satisfy the arbitrary standard. *Id.* (stating that "an unwise or even unconsidered decision by the union is not necessarily an irrational decision").

"A union acts in a discriminatory manner if its conduct is invidious, or 'based upon impermissible or immutable classifications such as race or other constitutionally protected categories, or arises from prejudice or animus.'"  *Dragomier*, 64 F. Supp. 3d at 1054 (quoting *Considine v. Newspaper Agency Corp.*, 43 F.3d 1349, 1359–60 (10th Cir. 1994)).  To establish discriminatory animus, a plaintiff must "adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives."  *Amalgamated Ass'n of Street, Electric Railway & Motor Coach Employees of Am. v. Lockridge*, 403 U.S. 274, 301 (1971).

A union acts in bad faith if "it acts with an improper intent, purpose, or motive . . . ecompass[ing] fraud, dishonesty, and other intentionally misleading conduct."  *Merritt*, 613 F.3d at 619.  The union representative must have been aware that his statements were false when he made them in order to constitute fraud.  *See Humphrey v. Moore*, 375 U.S. 335, 348 (1964) (stating that "there [was] no substantial evidence of fraud, deceitful action or dishonest conduct" when a union representative "act[ed] upon information then available to him," even though his assurances to the union members were not well founded).  "Thus, if allegations of bad faith are based on comments made by a union representative, the *subjective* intent of the union representative is the relevant consideration."  *Dragomier*, 64 F. Supp. 3d at 1055 (quotation omitted) (emphasis in original).  "A union's decision not to process a grievance is not grounds

27

for claiming the union breached its duty if it is based on a good faith determination that the grievance is without merit." *Id.* (quotation and ellipsis omitted).

I conclude that Hank's fair representation claim is a hybrid Section 301 claim, because the essential nature of his claim is rooted in the relationship between Great Lakes, the Union, and himself. *White*, 899 F.2d at 561–62.  Here, Hank's complaint advances two theories of how the Union breached its duty of fair representation, both of which are based on the CBA.[4]  ECF Doc. 1-1, Page ID# 18–19.  First, Hank alleges that the Union "acted in a discriminatory, arbitrary, and perfunctory manner" when it advised Great Lakes to fire him, resulting in a wrongful termination in violation of the CBA.  *Id.*  Second, Hank alleges that the Union acted "in a discriminatory, arbitrary, and perfunctory manner at Mr. Hank's grievance hearing, and by subsequently failing to maintain an action on Mr. Hank's behalf . . . pursuant to the CBA."  *Id.* at 19.  Further, unlike the employee in *Pratt*, Hank's complaint names Great Lakes as a defendant to his hybrid Section 301 claim, he alleges a breach under the CBA, and his claim relates to his termination and his subsequent grievance.  *Compare Pratt*, 939 F.2d at 389, *with* ECF Doc. 1-1, Page ID# 18–19.  Moreover, Hank's complaint identifies his claim as a "hybrid Section 301

---

[4] In his opposition brief, Hank also asserts that the Union violated its duty of fair representation by: (1) assigning Seisel to his case without training him; (2) failing to adequately inform him of his rights under the CBA; and (3) permitting another union member to take his job after he was removed.  ECF Doc. 183, Page ID# 4503–04.  Hank's complaint did not make these allegations.  ECF Doc. 1-1 at 18–19.  Consequently, the complaint did not give the Union notice that it would have to defend against the allegations; as a result, those allegations are not part of his Count IV claim.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that a defendant is entitled to be given "fair notice of what the claim is and the grounds upon which it rests").  Nonetheless, even if these arguments were able to be considered, they don't save Hank's Count IV.  There is no genuine dispute of material fact that: (1) Seisel had received in-house training through the Union; (2) Hank was informed of his rights to file a grievance and seek employment through he referral system, and he understood the rights he waived by signing the Release; and (3) he gave up his right to recall to his position when he signed the Release.  ECF Docs. 19, 113-5, 138, 139, and 178, Page ID# 232, 337–38, 2207, 3580–81, 4312.  Thus, the Union did not behave in a discriminatory, arbitrary, or bad faith manner in assigning Seisel to his case, failing to inform him of his rights under the CBA, and permitting another union member to take his job.  *Merritt*, 613 F.3d at 619.  Furthermore, neither Hank's opposition brief nor his complaint asserts that the Union breached its duty to fairly represent him with regard to the referral system.  ECF Docs. 1-1 and 183, 18–19, 4496–4504.

claim," and does not invoke either Section 9(a) or 28 U.S.C. § 1337. ECF Doc. 1-1, Page ID#
18. Thus, in order to survive summary judgment, Hank must show both that: (1) Great Lakes
breached the CBA; and (2) the Union breached its duty of fair representation. *Garrish*, 417 F.3d
at 594; *Courie*, 577 F.3d at 630.

Hank fails on both prongs. First, he has not produced sufficient evidence for a reasonable
jury to conclude that Great Lakes breached the CBA when it terminated him. *Anderson*, 477
U.S. at 250–52; *Garrish*, 417 F.3d at 594; *Courie*, 577 F.3d at 630. The undisputed record
evidence shows that, under the CBA, Great Lakes retained the authority to manage its own
business, to determine whether Hank satisfactorily performed his job duties, and to terminate an
employee for just cause. ECF Docs. 183 and 19-3, 275, 294, 4503. Thus, Great Lakes validly
exercised its authority under the CBA by ending Hank's employment after it determined that
Hank violated company policy and failed to render satisfactory performance when he submitted
false timecards. At that stage, Hank did not dispute the results of the time card investigation.
ECF Docs. 19, 19-3, 137 and 183, Page ID# 181–83, 275, 294, 3246–48, 3250, 3263–64, 4503,
4577–79. Hank also has not produced any evidence that his termination was unjust, beyond his
own conclusory statements that Great Lakes actually terminated him in retaliation for his
workers' compensation claims on the pretext of time card falsification. *Alexander*, 576 F.3d at
560; *see also Spengler v. Worthington Cylinders*, 615 F.3d 481, 493 (6th Cir. 2010) (stating that,
to show that an employer's legitimate reason for an adverse employment action was mere pretext
for retaliation, a plaintiff must show that the stated reason has no basis in fact, it was not the
actual reason for the termination, or the reason offered was insufficient to explain the employer's
action); ECF Docs. 19-5, 139, 178, 183, Page ID# 373, 3581, 4312, 4483. Moreover, Hank's
argument that the Release violated the CBA because it waived "non-waivable rights" to file

29

claims and grievances is foreclosed by this Court's ruling that his waivers of all claims were valid.  ECF Doc. 174, Page ID# 4278–79.  Furthermore, his argument that the Release violated the CBA because it waived his "non-waivable" right to recall is unavailing, as he has not produced any evidence that he would have the "qualifications" for recall under the CBA, after Great Lakes determined he had violated company policy and failed to perform his job satisfactorily.  ECF Doc. 19-3, Page ID# 308.  Thus, Hank has not produced sufficient evidence for a reasonable jury to conclude that Great Lakes breached the CBA.  *Anderson*, 477 U.S. at 250–52; *Garrish*, 417 F.3d at 594; *Courie*, 577 F.3d at 630.

Second, Hank has not produced sufficient evidence for a reasonable jury to conclude that the Union breached its duty to fairly represent him.  *Anderson*, 477 U.S. at 250–52; *Garrish*, 417 F.3d at 594; *Courie*, 577 F.3d at 630.  Hank has not pointed to any evidence in the record showing that Seisel's statement that "contractors do not hesitate to terminate employees for stealing," was based on a discriminatory animus.  *Merritt*, 613 F.3d at 619; *Dragomier*, 64 F. Supp. 3d at 1054; *Lockridge*, 403 U.S. at 301.  Further, even assuming that Seisel exhibited flawed judgment when he made that comment, the undisputed record evidence does not show that it was "wholly irrational" or in bad faith, as Seisel based his comment on his own experience, his belief that Hank had admitted to stealing time at the meeting, and Hank's decision not to dispute the allegations against him at the meeting.  *Merritt*, 613 F.3d at 619; *Garrison*, 334 F.3d at 538; *O'Niell*, 449 U.S. at 78; *Humphrey*, 375 U.S. at 348; *Dragomier*, 64 F. Supp. 3d at 1055; ECF Docs. 19, 137, 139, and 183, Page ID# 181–83, 3268, 3585, 4478–79.  Further, the undisputed Rule 56 evidence belies Hank's argument that Seisel "advised" Great Lakes to terminate him, as Seisel specifically stated that he could not give an opinion on what Great Lakes should do.  ECF Docs. 137, 139, and 183, Page ID# 3268, 3686, 4478–79.

30

Hank also has not pointed to any Rule 56 evidence showing that the Union's decision not to take his grievance to arbitration or otherwise maintain an action on his behalf was discriminatory, arbitrary, or in bad faith.  *Anderson*, 477 U.S. at 250–52; *Garrish*, 417 F.3d at 594; *Courie*, 577 F.3d at 630; *Merritt*, 613 F.3d at 619.  Even accepting as true that the Union knew he was disabled (and giving Hank the benefit of his affidavit erasing his testimony that he did not believe the Union discriminated against him), Hank has not produced any evidence that the Union's decision to not further pursue his grievance was based on a discriminatory animus. *Dragomier*, 64 F. Supp. 3d at 1054; *Lockridge*, 403 U.S. at 301; ECF Docs. 19-5, 138, 179, 183, and 183-3, Page ID# 373, 3381, 4312, 4483, 4513, 4515.  Furthermore, the undisputed Rule 56 evidence establishes that the Union based its decision not to further pursue Hank's grievance, or any other claim on his behalf, on its own review of Great Lakes' evidence that Hank had filed falsified timecards.  ECF Doc. 178, Page ID# 4314–15; *see also* ECF Docs 19, 139, and 183, Page ID# 181–83, 3586–87, 4478–79.  Thus, Hank has not produced evidence sufficient for a reasonable jury to conclude that the Union's decision not to pursue further Hank's grievance was arbitrary or in bad faith.  *Merritt*, 613 F.3d at 619; *Garrison*, 334 F.3d at 538; *O'Niell*, 449 U.S. at 78; *Humphrey*, 375 U.S. at 348; *Dragomier*, 64 F. Supp. 3d at 1055.

In sum, Hank has failed to produce evidence sufficient for a reasonable jury to conclude that Great Lakes breached the CBA, or that the Union breached its duty of fair representation.  I recommend that the Court find that the Union is entitled to judgment as a matter of law on Hank's hybrid Section 301 claim.  Fed. R. Civ. P. 56(a); *Maben*, 887 F.3d at 258; *Garrish*, 417 F.3d at 594; *Courie*, 577 F.3d at 630.

### D.     Hank's State Law Disability Discrimination Claim

The Union requests that this court dismiss for lack of subject matter jurisdiction or remand to state court Hank's remaining state law disability discrimination claim, brought under Ohio Rev. Code Ann. § 4112.02.  ECF Doc. 178, Page ID# 4336–37.  The Union asserts that, because this court has only supplemental jurisdiction over Hank's § 4112.02 claim, dismissal or remand of that claim would be appropriate if this court grants the Union summary judgment on Hank's hybrid Section 301 claim.  *Id.*  Hank's response in opposition does not address the Union's request that this court decline to continue to exercise supplemental jurisdiction over his state law claims.  *See generally* ECF Doc. 183, Page ID# 4483–504.  Previously, Hank sought to have the case remanded and has objected (ECF Doc. 185) to my recommendation that the remand motion be denied (a recommendation made before the instant analysis of the Union's summary judgment motion).  It is doubtful he would object to remand now.  Notably, with the Court's prior dismissal of plaintiff's claims against Great Lakes (ECF Doc. 174), the only claim remaining if this report and recommendation is adopted would be Hank's state law claim against the Union.

District courts may decline to exercise supplemental jurisdiction over state law claims if "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c); *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996) (noting that a district court is not obligated to dismiss or retain jurisdiction over state law claims, except in a few circumstances, and that "dismissal on a motion for summary judgment [does] not affect the trial court's ability to resolve supplemental claims").  Generally, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed."  *Musson*

*Theatrical, Inc.*, 89 F.3d at 1254–55; *see also Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991) (stating that only "overwhelming interests in judicial economy may allow a district court to properly exercise its discretion and decide a pendent state claim even if the federal claim has been dismissed before trial").

Because summary judgment should be granted on Hank's hybrid Section 301 claim, and because Hank's sole remaining claim arose under state law, the balance of considerations favors remanding Hank's state law discrimination claim to state court.  28 U.S.C. § 1367(c); *Musson Theatrical, Inc.*, 89 F.3d at 1254–55.  I recommend that the Court decline to continue to exercise supplemental jurisdiction over Hank's state law disability discrimination claim and grant the Union's request for a remand of that claim to state court.

## IV.   Recommendations

I recommend that the Union's motion for summary judgment (EFC Doc. 178) be **GRANTED** on Claim IV.  I also recommend that the Union's motion to strike Hank's affidavit be **DENIED**, as it is admissible in part under the sham affidavit rule.  The granting of summary judgment to the Union on Hank's hybrid Section 301 claim leaves Hank without any claims over which this court has original jurisdiction.  Thus, I recommend that we decline to exercise supplemental jurisdiction over Hank's remaining state law disability discrimination claim, and that the Union's request for a remand of that claim to state court (EFC Doc. 178, Page ID# 4336–37)  be **GRANTED.**

Dated: September 28, 2018

Thomas M. Parker
United States Magistrate Judge

_____

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).